## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JASON J. JONES,

       Plaintiff,

v.                                      CIV. NO. 13-683-GBW

CAROLYN W. COLVIN,
*Acting Commissioner of the*
*Social Security Administration,*

       Defendant.

## **ORDER GRANTING MOTION TO REMAND TO AGENCY**

This matter comes before the Court on Plaintiff's Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum. *Doc. 24.* Having reviewed the briefing (*docs. 24, 25, & 26*), the record, and the applicable law, the Court will GRANT Plaintiff's motion and REMAND this action to the Commissioner for further proceedings consistent with this opinion.

### I.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a court may review a final decision of the Commissioner only to determine whether it (1) is supported by "substantial evidence," and (2) comports with the proper legal standards. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991). "In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Casias*, 933 F.3d at 800.  "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id*. at 1010.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.   BACKGROUND

### A.  Procedural History

Plaintiff filed applications for disability benefits under Title II and Title XVI on March 9, 2009, alleging a disability onset date of December 31, 2006.  AR at 18.  His claims were initially denied on June 12, 2009, and again denied after reconsideration on June 14, 2010.  *Id.*  Upon Plaintiff's request, a hearing was held on December 13, 2011, in front of Administrative Law Judge (ALJ) Ben Willner.  *Id.*  A vocational expert, Mary Diane Weber, also attended the hearing.  *Id.*  The ALJ subsequently issued an opinion finding that Plaintiff was not entitled to benefits.  AR at 26.  The SSA Appeals Council denied

Plaintiff's request for review of the ALJ's decision.  AR at 1.  Plaintiff now moves for this Court to remand the ALJ's decision.

### B.  Plaintiff's Medical History

Plaintiff, who was 38 years old at the time of his alleged disability onset date, suffers from the following "severe" impairments: obesity, obstructive sleep apnea, congestive heart failure, hypertension, and diabetes mellitus.  AR at 20.  Plaintiff appears to have weighed between 333 lbs. and 310 lbs. between December 2006 and February 2011 with his weight generally trending downward.  AR at 254, 383.  Plaintiff challenges the ALJ's assessment of the opinions of his treating physicians Daniel Friedman, M.D., and Travis Fisher, M.D.  Particularly at issue are medical assessments by Dr. Friedman and Dr. Fisher regarding Plaintiff's ability to do work, (AR at 408, 413), as well as Dr. Fisher's mental assessment of Plaintiff, (AR at 409-12).  The Court's written review of the record focuses on Plaintiff's severe impairments.

On December 15, 2006, Plaintiff visited Presbyterian Urgent Care complaining of a sore throat and pain during urination.  AR at 254.  Joseph E. Bish, PAC, noted his clinical impression to be strep throat, urinary tract infection (UTI), and high blood pressure.  AR at 256.

On October 31, 2007, Plaintiff was seen by Daniel Friedman, M.D., at the Presbyterian Heart Group.  AR at 278-79.  Dr. Friedman noted that Plaintiff's heart was "doing okay" but he was concerned about Plaintiff's blood pressure.  AR at 279.  He

further noted that one of Plaintiff's medications, Norvasc, "caused a lot of leg swelling."

AR at 279.  Dr. Friedman increased one of Plaintiff's medications and wrote a prescription

for Plaintiff to get a blood pressure cuff that would allow him to regularly check his blood

pressure.  AR at 279.  Plaintiff was to return in six months and, in the intervening time, let

Dr. Friedman know if his blood pressure remained high.  Dr. Friedman noted he "may

add low dose minoxidil" if this were the case.  AR at 279.

On December 31, 2007, Plaintiff was seen by Rachel Cunnick, PAC, at the

Presbyterian Endocrinology Clinic to establish himself as a new patient.  AR at 261.

Plaintiff reported that he had "been a type 2 diabetic for approximately 4-5 years," and

that he "want[ed] to get off some of his medications."  AR at 261.  Plaintiff further

reported that he had suffered from hypertension since he was 21 years old, and that he

had experienced swelling when taking one hypertension medication so he switched to

another.  AR at 261.  Ms. Cunnick assessed diabetes mellitus type 2 uncontrolled,

hypertension, and obesity.  AR at 262-71.

On January 21, 2008, Plaintiff had a follow-up appointment at the Presbyterian

Endocrinology Clinic where he was again seen by Ms. Cunnick.  AR at 259.  Ms. Cunnick

addressed Plaintiff's diabetes, hypertension, and obesity, and made recommendations to

Plaintiff for treatment. AR at 259-60.

On June 13, 2008, Plaintiff again saw Dr. Friedman at the Presbyterian Heart

Group.  AR at 276.  Plaintiff's chief complaint was that "his blood pressure has been

4

higher."   AR at 276.  Plaintiff stated that he does not check his blood pressure a lot, but

that it had been high when he visited his endocrinologist.  AR at 276.  Dr. Friedman's

impression was that "[t]here are a lot of issues," but that Plaintiff's "biggest problem is

the blood pressure. It is quite high."  AR at 276.

On September 25, 2008, Plaintiff saw Dr. Friedman for a third time.  AR at 273.

Plaintiff's complained that there was "a lot of swelling when he increased the Norvasc."

AR at 274.  Plaintiff stated that "he started having pain in his shins . . . as if it was being

stretched."  AR at 274.  Dr. Friedman raised concerns that Plaintiff's hypertension may

have a "secondary cause" such as renal artery stenosis, but Dr. Friedman doubted as

much.

On March 9, 2009, Plaintiff filed his application for benefits alleging disability

based on hypertension, diabetes mellitus, gout, and depression with mood swings.  AR at

18.

On April 2, 2009, Plaintiff saw Dr. Friedman for a fourth time.  AR at 270.

Plaintiff's chief complaints were that he felt fatigued, had high blood pressure, and had

some swelling around his face.  AR at 271.  Dr. Friedman noted that Plaintiff's "marked

hypertension . . . [had] been very difficult to control."  AR at 271.  Dr. Friedman wanted

to do "an MRA of his renal arteries," but Plaintiff was resistant.  AR at 271.  The two

agreed to do an ultrasound instead.  AR at 271.  On April 7, 2009, on Plaintiff's fifth visit

with Dr. Friedman, Dr. Friedman conducted a Renal Arterial Duplex Ultrasound, which

confirmed Dr. Friedman's belief that Plaintiff's hypertension did not have a secondary

cause, as there was "no evidence of rental artery stenosis."  AR at 283.

On June 12, 2009, John Pataki, M.D., a state agency medical consultant, completed

a Physical Residual Functional Assessment of Plaintiff.  AR at 286-94.  Dr. Pataki found

that Plaintiff can occasionally lift 20 lbs., frequently lift 10 lbs., stand and/or walk (with

normal breaks) for six hours in an 8-hour day, and sit (with normal breaks) for six hours

in an 8-hour day.  AR at 287.  Dr. Pataki noted that because Plaintiff had hypertension,

"which has been difficult to control even with 5 different drugs," "it [was] reasonable to

avoid heavy lifting."  AR at 293.

Also on June 12, 2009, Scott Walker, M.D., completed a Psychiatric Review

Technique Form for Plaintiff.  AR at 294.  Dr. Walker found that there was insufficient

medical evidence to substantiate Plaintiff's allegation of depression with mood swings

and that Plaintiff had no medically determinable mental impairment. AR at 294.  In

reaching this conclusion, Dr. Walker reviewed Plaintiff's medical records, which included

three of Plaintiff's meetings with Dr. Friedman and one of his meetings with Ms.

Cunnick, each of which had noted Plaintiff's mood and orientation.  AR at 306.

Concurrent with Dr. Pataki's and Dr. Walker's assessments, Plaintiff's initial applications

for benefits were denied.  AR at 64-67.

On August 13, 2009, the Kaseman Sleep Lab at Presbyterian Hospital conducted a

sleep study of Plaintiff.  AR at 343-58.  Richard Seliqmar, M.D., interpreted the results of

the study as indicating that Plaintiff had moderate "obstructive sleep apnea syndrome," that there was evidence of "moderate hypoxemia," and that "[t]here is demonstration of moderate sleep-related hypoventilation."  AR at 345.  Dr. Seliqmar identified "[e]xcessive daytime somnolence and hypertension as comorbidities."  AR at 345.  Dr. Seliqmar noted Plaintiff's reluctance to use a continuous positive air pressure (CPAP) machine, which "delivers air pressure through a mask placed over your nose while you sleep" and is used to treat "moderate to severe sleep apnea."  Mayo Clinic, Sleep Apnea: Treatment and Drugs, http://www.mayoclinic.org/diseases-conditions/sleep-apnea/basics/treatment/con-20020286 (last visited September 24, 2014).

On May 18, 2010, Samuel Pallin, M.D., a state agency medical consultant reviewed Plaintiff's initial disability application and determination was well as the results of both the sleep study and ultrasound of Plaintiff's heart.  AR at 359.  Dr. Pallin concluded the initial "light level RFC was reasonable, [Plaintiff] indicates nothing has changed, and he provides no new Function report.  New MER is limited and [Plaintiff] is non compliant w recommendation for CPAP which would have the potential to improve his Htn control. The prior DDS RFCF is hereby affirmed."  AR at 359.  On June 14, 2010, Plaintiff's claims for benefits were again denied.  AR at 70.

On September 22, 2010, after his benefits had been denied on reconsideration, Plaintiff saw Dr. Friedman a sixth time.  AR at 381.  Plaintiff's chief complaint was that his blood pressure had been high.  AR at 381.  Dr. Friedman noted that, if they were

unable to get Plaintiff's blood pressure down, he "would add minoxidil" to Plaintiff's prescriptions.  AR at 382.  Dr. Friedman, apparently unaware of Plaintiff's sleep study, also stated, "I would be worried he could have sleep apnea. That certainly could contribute to blood pressure.  At some point, evaluation for such may be appropriate." AR at 382.  Dr. Friedman further stated that "[Plaintiff's] diabetes is not ideally controlled.  I think exercise is going to help all those things as well."  AR at 382.  Dr. Friedman recommended exercise and hoped Plaintiff would "lose 15 pounds in the next six months."  AR at 382.  Plaintiff was also to "ask his significant other if there is any evidence that he is having apneic episodes," "to keep tabs on his blood pressure," and to follow up with Dr. Friedman in six months.  AR at 382.

On January 1, 2011, Plaintiff was admitted to the hospital where he reported feeling "tightness in his chest."  AR at 389.  He was discharged on January 4, 2014, with a discharge diagnosis of pneumonitis, which "is a general term that refers to inflammation of lung tissue."  Mayo Clinic, Diseases and Conditions: Pneumonitis, http://www.mayoclinic.org/diseases-conditions/pneumonitis/basics/definition/con-20031011 (last visited September 24, 2014).

On or about January 2, 2011, while Plaintiff was still at the hospital, Bryan Beck, M.D., of the Presbyterian Cardiovascular Lab conducted an echocardiogram on Plaintiff. AR at 385.  Dr. Beck recorded his conclusions as "1. Normal left ventricular contraction pattern with mild to moderate left ventricular hypertrophy and associated diastolic

dysfunction. 2. Mild tricuspid regurgitation with at least moderate pulmonary hypertension."  AR at 386.

On January 7, 2011, Plaintiff was seen by Travis Fisher, M.D., at the Presbyterian Medical Group for a follow up on his hospital visit.  AR at 400. Dr. Fisher is listed as Plaintiff's Primary Care Physician in a number of forms, (*see, e.g.,* AR at 396, 398, 399), and was sent Plaintiff's Discharge Summary from his hospital visit, (AR at 390).  On January 20, 2011, Plaintiff was seen at the Presbyterian Medical Group, where Dr. Fisher practices, for a blood pressure check.  AR at 399.

On January 25, 2011, Plaintiff saw Dr. Friedman for the seventh time.  AR at 375. Plaintiff's chief complaint was that he had been feeling dizzy.  AR at 375.  Dr. Friedman was aware of Plaintiff's hospital visit and echocardiogram.  AR at375.  Dr. Friedman stated his impression as follows:

1. The patient has a history of diastolic heart failure. Fortunately, right now he is stable . . .
2. He does have hypertension. Interestingly, it has actually been low.  I am a little puzzled by this. . . . Perhaps the cessation of alcohol resulted in some reduced fluid retention. He is on a fair amount of medication. I explained to him and his significant other we want to reduce things gradually.
3. He did have a low oxygen saturation level in the hospital. Right now it is normal. He is going to see a pulmonary doctor.  It would not surprise me if he had some sleep apnea.  That certainly could affect blood pressure as well.

AR at 376.  Dr. Friedman took Plaintiff off of Norvasc, which as noted earlier was believed to have caused Plaintiff's swelling.  AR at 398.

On January 31, 2011, Plaintiff was seen again by Dr. Fisher for a follow up on his

blood pressure.  AR at 398.  Dr. Fisher reported that Plaintiff's blood pressure was "good."  AR at 398.

On February 2, 2011, during his eighth meeting with Plaintiff, Dr. Friedman performed a Transthoracic Echocardiogram.  AR at 383.  Based on that test, Dr. Friedman's impressions were "Left ventricular systolic function is normal.  Moderate pulmonary hypertension.  Antibiotic prophylaxis for invasive procedures is not indicated per ACC/AHA guidelines."  AR at 384.  Dr. Friedman further noted that "[c]ompared with the previous study of January 2, 2011: PHT[1] is reduced."  AR at 384.

### Dr. Friedman's Medical Opinion regarding Plaintiff's Ability to Work

On December 5, 2011, Dr. Friedman completed a form outlining his medical opinion regarding Plaintiff's ability to do work-related activities.  AR at 408.  Dr. Friedman noted that he had been treating Plaintiff since 2005, and that Plaintiff suffered from congestive heart failure, hypertension, and pulmonary hypertension.  AR at 408.  He stated his medical findings to be "echo-preservered left ventricular systolic function with left ventricular hypertrophy; mild tricuspid regurgitation, [and] moderate pulmonary hypertension."  AR at 408.

Regarding Plaintiff's physical abilities, Dr. Friedman noted that, in an 8-hour workday, Plaintiff could stand and walk with normal breaks for a maximum of four hours, and could sit between three to four hours.  AR at 408.  Dr. Friedman further noted

---

[1] Presumably, by "PHT," Dr. Friedman meant pulmonary hypertension.

that Plaintiff was not limited in his ability to lift and carry, but added a notation that the

maximum weight Plaintiff could frequently lift was "what patient feels comfortable

with."  AR at 408.  According to Dr. Friedman, Plaintiff also required "the freedom to

shift at will between sitting or standing/walking" because "patient gets dizzy or

lightheaded during the day at different times."  AR at 408.  Plaintiff also "need[s] to lie

down at unpredictable times during an 8-hour workday."  AR at 408.  Finally, Dr.

Friedman anticipated that Plaintiff would, on average, be absent from work more than

three times a month due to his "impairments, conditions, symptoms and treatment." AR

at 408.

### Dr. Fisher's Medical Opinion regarding Plaintiff's Ability to Work

On December 13, 2011, the same day as Plaintiff's hearing before the ALJ, Dr.

Fisher completed a form outlining his opinions on Plaintiff's ability to do work-related

activities.  AR at 413.  Dr. Fisher noted that he had been treating Plaintiff since July 2009,

and that Plaintiff suffered from hypertension, diabetes mellitus, poor control, dizziness,

gout, hyperlipidemia, obesity and sleep apnea.  AR at 413.  Under medical findings he

noted Plaintiff's weight and blood pressure from visits on November 2011 and December

2011. AR at 413.

Regarding Plaintiff's physical abilities, Dr. Fisher noted that, in an 8-hour

workday, Plaintiff could stand and walk with normal breaks for a maximum of less than

four hours, and was not limited in his ability to sit.  AR at 413.  Dr. Fisher further noted

that Plaintiff was not limited in his ability to lift and carry. AR at 413. Unlike Dr.

Friedman, Dr. Fisher concluded that Plaintiff does not require "the freedom to shift at

will between sitting or standing/walking." AR at 413. Similarly, Dr. Fisher concluded

that Plaintiff does not "need to lie down at unpredictable times during an 8-hour

workday." AR at 413. Dr. Fisher stated that "[Plaintiff's] limitations due to fatigue,

dizziness, risk of injury and high [blood pressure]. Motor strength normal." AR at 413.

Finally, Dr. Fisher anticipated that Plaintiff would, on average, be absent from work more

than three times a month due to his "impairments, conditions, symptoms and treatment."

AR at 413.

### Dr. Fisher's Mental Impairment Questionnaire

Dr. Fisher also completed a Mental Impairment Questionnaire. AR at 409-412. Dr.

Fisher noted his diagnosis as "(1) htn [hypertension] (2) DM [diabetes mellitus] (3) obesity

(4) hyperlipidemia & (5) sleep apnea." AR at 409. When asked to "[d]escribe the *clinical*

*findings* including results of mental status examination which demonstrate severity of

your patient's mental impairment and symptoms," Dr. Fisher wrote "MMSE = not done,

[Plaintiff] appeared depressed and overwhelmed, and tired." AR at 410. Dr. Fisher

recounted the side effects of Plaintiff's medications. AR at 410. Next, he noted the degree

to which Plaintiff's mental impairments affected Plaintiff's functional abilities. AR at 410-

11. Out of 11 listed abilities, Dr. Fisher did not answer for one (1) ability, found Plaintiff's

mental impairments had no impact on eight (8) abilities, and had a marked impact on two

(2) abilities.  AR at 410-11.  "Marked" "means more than moderate, but less than extreme."  AR at 411.  The two markedly impacted abilities were Plaintiff's "ability to maintain attention and concentration for extended periods" and his "ability to perform activities within a schedule, be punctual and maintain regular attendance." AR at 411.  Dr. Fisher opined that Plaintiff was not currently able to work because he "appears down and overwhelmed."  AR at 411.  On the signature line for "Treating Psychologist/Psychiatrist," Dr. Fisher signed with the addendum "Internal medicine not behavioral health."  AR at 412.

### C. The ALJ's Decision

On April 12, 2012, the ALJ issued a decision denying Plaintiff's benefits.  AR 26.  For purposes of Social Security disability insurance benefits, an individual is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a person satisfies these criteria, the SSA has developed a five-step test.  *See* 20 C.F.R. § 416.920.  If the Commissioner is able to determine whether an individual is disabled at one step, he does not go on to the next step.  *Id*. § 416.920(a)(4).

At the first four steps of the analysis, the claimant has the burden to show that: (1) he is not engaged in "substantial gainful activity"; that (2) he has a "severe medically

determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and that either (3) his impairment(s) meet or equal one of the "Listings" of presumptively disabling impairments; or (4) he is unable to perform his "past relevant work."  416.920(a)(4)(i–iv); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).

Step four of this analysis consists of three phases.  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).  First, the ALJ determines the claimant's residual functional capacity (RFC) in light of "all of the relevant medical and other evidence." 20 C.F.R. § 416.945(a)(3).  A claimant's RFC is "the most [he] can still do despite [his physical and mental] limitations."  *Id*. § 416.945(a)(1).  Second, the ALJ determines the physical and mental demands of claimant's past work.  "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'"  *Winfrey*, 92 F.3d at 1024 (quoting Social Security Ruling 82-62 (1982)).  Third, the ALJ determines whether, in light of his RFC, the claimant is capable of meeting those demands.  *Id*. at 1023, 1025.

If the ALJ determines the claimant cannot engage in past relevant work, she will proceed to step five of the evaluation process. At step five, the burden of proof shifts to the Commissioner to show the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.  *Grogan*, 399 F.3d at 1257.

Here, at steps one, two, and three, respectively, the ALJ found that Plaintiff had

not engaged in substantially gainful activity since his application date, that his physical

impairments were severe, but that these impairments did not meet or equal the severity

of a listed impairment.  AR at 20-21.  At the fourth step, the ALJ found that Plaintiff's RFC

meant he was capable, with some additional limitations, of performing "light work," 20

C.F.R. § 416.967(b), which included his "past relevant work" as a health club manager, 20

C.F.R. § 416.960(b).   AR at 21, 25.  Having found Plaintiff not disabled at the fourth step,

the ALJ denied his application for benefits.  AR at 26.

## III.   ANALYSIS

Plaintiff argues that the ALJ erred by (1) failing to discuss how the side effects of

Plaintiff's medications affected his RFC; (2) failing to discuss how Plaintiff's morbid

obesity affected his RFC; (3) failing to provide adequate reasons for rejecting Plaintiff's

treating physicians opinions; and (4) failing to provide sufficient reasons for rejecting

Plaintiff's subjective symptom testimony.  *Doc. 24* at 12-23.  Because the Court finds that

the ALJ erred in assessing Plaintiff's treating physicians' opinions, the Court will

REMAND this case to the Commissioner for further proceedings consistent with this

opinion.  Given this error, Plaintiff's other arguments are not addressed.

### A. <u>The Treating Physician Rule</u>

The Tenth Circuit has outlined a two-step inquiry for determining the weight to be

given to a claimant's treating physician's opinions.  At the first step, an ALJ must

determine whether a treating source's opinion is entitled to controlling or dispositive weight.  To give anything less than controlling weight, the ALJ must demonstrate that the opinion (1) is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," or (2) is "inconsistent with other substantial evidence" on the record.  20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  If the ALJ's decision to refuse to give controlling weight for either of the above two reasons is not supported by substantial evidence, remand is required.

Even if an ALJ determines that a treating source opinion is not entitled to controlling weight, the opinion is still entitled to deference. *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2p, 1996 WL 374188 (July 2, 1996).  Thus, after refusing to afford controlling weight, the ALJ must, at the second step, apply the six factors listed in SSA regulations to determine what weight to give a non-controlling treating source opinion.  20 C.F.R. § 416.927(c)(2) ("When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight we give you treating source's opinion"); 20 C.F.R. § 404.1527(c)(2) (same).  The six factors to be considered in determining an opinion's weight are:

    a.  the length of the treatment relationship and the frequency of examination;
    b.  the nature and extent of the treatment relationship;
    c.  the degree to which a medical source provides supporting explanations for the opinion;

    d.  the degree to which the opinion is consistent with the record as a whole;

    e.  whether the medical source is a specialist in area related to the opinion; and

    f.  any other factors that tend to contradict or support an opinion

*See* 20 C.F.R. § 416.927(c)(2)-(6); 20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ need not explicitly

consider and apply each and every factor to each opinion.  *Oldham,* 509 F.3d at 1258

("That the ALJ did not explicitly discuss all the [SSA] factors for each of the medical

opinions before him does not prevent this court from according his decision meaningful

review") (citations omitted).  The ALJ must, however, "make clear how much weight the

opinion is being given (including whether it is being rejected outright) and give good

reasons, tied to the factors specified in the cited regulations for this particular purpose,

for the weight assigned."  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011) (citing

*Watkins*, 350 F.3d at 1300-01).

      Regarding these two steps, the Tenth Circuit has repeatedly stated that they must

be taken sequentially such that the reasons for refusing to afford controlling weight and

the reasons for assigning a particular weight are clearly delineated. *Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003);  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011)

("Our case law, the applicable regulations, and the Commissioner's pertinent Social

Security Ruling (SSR) all make clear that in evaluating the medical opinions of a

claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each

step of which is analytically distinct.");  *see also Robinson v. Barnhart*, 366 F.3d 1078, 1083

(10th Cir. 2004) (Finding error where "[a]lthough it [was] obvious from the ALJ's decision

that he did not give [the treating source's] opinion controlling weight, the ALJ never expressly stated that he was not affording it controlling weight, nor did he articulate a legitimate reason for not doing so."); *Chrisman v. Colvin*, 531 F. App'x 893, 900-01 (10th Cir. 2013) (unpublished) (stating that an ALJ's failure to follow the sequential, analytically distinct two-step inquiry requires remand).  Admittedly, some overlap exists between the two bases for denying controlling weight and the six factors to be considered in assigning a less-than-controlling weight.[2]  The Tenth Circuit has nevertheless explained that "[e]xplicit findings properly tied to each step of the prescribed analysis facilitate meaningful judicial review," and are therefore required to avoid remand.  *Chrisman*, 531 F. App'x at 901 (unpublished); *see also Watkins*, 350 F.3d at 1300.

## B.  <u>The ALJ's Analysis does not abide by the Treating Physician Rule.</u>

Upon comparing the required legal analysis for treating source opinions to the analysis in the ALJ's opinion, the need for remand becomes apparent.  In analyzing Plaintiff's treating physicians' opinions, the ALJ committed reversible error when he failed to support his decision to refuse controlling weight with substantial evidence and when he collapsed the two-step inquiry into a single analysis.

---

[2] *Compare* 20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2) (an opinion that is not well-supported by "medically acceptable clinical and laboratory diagnostic techniques" or that is "inconsistent with other substantial evidence" in the record may be denied controlling weight) *with*  20 C.F.R. § 416.927(c)(3); 20 C.F.R. § 404.1527(c)(3) (the more an opinion is supported by relevant evidence, "particularly medical signs and laboratory findings," the more weight it is to be given) *and* 20 C.F.R. § 416.927(c)(4); 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give that opinion").

1.  <u>The ALJ's decision not to afford controlling weight to Dr. Friedman's opinions
    is not supported by substantial evidence.</u>

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

"light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he can only

frequently climb, balance, kneel, crouch, and crawl, and only occasionally stoop.

Additionally, the claimant must avoid concentrated exposure to extreme heat and

extreme cold."  AR at 21.  In determining Plaintiff's RFC and finding him capable of

performing his past relevant work, the ALJ afforded greater weight to the state agency

consultants' medical opinions than to those of Plaintiff's treating physicians, to which he

gave "limited weight."  AR at 25.  Having assigned an RFC of light work, the ALJ relied

on the testimony of the vocational expert (VE) to determine that Plaintiff could perform

his past relevant work as a health club manager, which the VE characterized as a

"membership solicitor."  AR at 57.  Importantly, upon inquiry from the ALJ, the VE also

testified, "Typically most companies will allow on average one day per month absence on

a consistent basis if necessary.  But if it were three or more times over and over again, that

individual would not be able to maintain work at [jobs available in the national economy]

or any others."  AR at 60.  As noted above, Plaintiff's treating physicians both opined that

Plaintiff would miss work three or more days a month due to his impairments.

The ALJ offered the following explanation for affording "limited" weight to Dr.

Friedman's and Dr. Fisher's opinions about Plaintiff's physical limitations: "Their

opinions are not supported by the claimant's medical records, and seem to be based on

the claimant's subjective complaints.  In addition, there are inconsistencies between their

opinions as to what the claimant can and cannot do."  AR at 25.  Plaintiff argues that

although the ALJ claimed to have given "limited weight" to Plaintiff's treating

physicians, he, in truth, rejected them.  *Doc. 24* at 18.  The Commissioner does not

disagree, and instead argues that the ALJ appropriately rejected those opinions.  *Doc. 25*

at 14 ("If the ALJ rejects a treating physician's opinion, he must provide specific

legitimate reasons for doing so, which the ALJ did in this case") (citations and quotations

omitted)).  Although the absence of supporting medical evidence for an opinion and an

opinion's inconsistency with other substantial evidence in the record are both legitimate

grounds for refusing controlling weight, the ALJ's analysis does not put forth substantial

evidence to support his decision to do so.

   a.  *Substantial evidence does not support the ALJ's refusing to give Dr. Friedman's*
       *opinions controlling weight for lacking supporting medical evidence.*

As noted above, to give anything less than controlling weight, the ALJ must

demonstrate that the opinion (1) is not "well-supported by medically acceptable clinical

and laboratory diagnostic techniques," or (2) is "inconsistent with other substantial

evidence" on the record.  20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  The ALJ did

not put forth substantial evidence to support his assertion that the treating physicians'

"opinions are not supported by the claimant's medical records, and seem to be based on

the claimant's subjective complaints."  AR at 25.  The term "medically acceptable"

"means that the clinical and laboratory diagnostic techniques that the medical source uses

are in accordance with the medical standards that are generally accepted within the medical community as the appropriate techniques to establish the existence and severity of an impairment." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2P (S.S.A July 2, 1996).  By requiring this foundational evidence, the SSA "helps to ensure that there is a sound medical basis for the opinion."  *Id.*  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir.2002)) (emphasis in original).

Here, the ALJ completely omits any explanation as to how the medical records do not support the treating physicians' opinions.  A colorable argument could be made that the dearth of Dr. Fisher's medical records in the administrative record undermines his opinions,[3] but Dr. Friedman saw Plaintiff at least eight times, conducted multiple tests (e.g. checking Plaintiff's blood pressure and performing an echocardiogram), and

---

[3] Plaintiff also argues that the ALJ erred by failing to solicit records from Dr. Fisher.  *Doc. 24* at 20; *see Robinson v. Barnhart*, 366 F.3d 1078 (2004) ("[T]he ALJ's statement that [a treating physician's] records did not give a reason for his opinion that claimant is unable to work triggered the ALJ's duty to seek further development of the record before rejecting the opinion.").  The Court need not address this argument because whether or not Dr. Fisher's opinions were entitled to controlling weight does not impact the ultimate disposition of this case.

prescribed medications to treat Plaintiff's heart conditions, which Dr. Friedman, of the Presbyterian Heart Group, specialized in treating.

Additionally, the ALJ's analysis is flawed because there is nothing in the record to suggest that Dr. Friedman's opinion that Plaintiff's congestive heart failure, hypertension, and pulmonary hypertension would cause Plaintiff to miss work often was based solely on Plaintiff's subjective complaints. *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (holding ALJ "improperly rejected [treating source's] opinion based upon his own speculative conclusion that the report was based only on claimant's subjective complaints where. . . [n]othing in [treating physician's] reports indicates he relied only on claimant's subjective complaints. . . ."). Thus, Dr. Friedman's opinions do not appear to be lacking a sound medical basis, and the ALJ's rejection of them on that ground appears to be improperly based on his "own credibility judgments, speculation or lay opinion." *Langley*, 373 F.3d at 1121. Accordingly, the ALJ's refusing to give controlling weight to Dr. Friedman's opinions on the ground that they are not supported by acceptable medical evidence is not supported by substantial evidence.

b. *Substantial evidence does not support the ALJ's refusing to give Dr. Friedman's opinions controlling weight on the ground that they are partially inconsistent with Dr. Fisher's.*

The partial inconsistency between a few of Plaintiff's treating physicians' opinions does not amount to substantial evidence sufficient to reject their unanimous opinion about Plaintiff's inability to regularly attend work. A treating source's opinion is

inconsistent with other substantial evidence in the record when there is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2p, 1996 WL 374188 (July 2, 1996).

To begin, the ALJ failed to delineate the inconsistencies to which he was referring. AR at 25. Having reviewed the record, the inconsistencies of note are the physicians' differing opinions about how long Plaintiff can sit, stand, and walk in an 8-hour day (though both assessed greater limitations than that provided for in the RFC), whether he needed to be able to alternate freely between sitting or standing and walking, and whether he needed to lie down periodically throughout the day. AR at 408, 413. In light of these conflicting opinions, a reasonable mind could accept that there is substantial evidence to support a conclusion contrary to these opinions, i.e. the other physician's conflicting opinion. Plaintiff's treating physicians, however, were unanimous in their opinion that Plaintiff would be absent from work more than three times per month (AR at 408, 413), which the VE testified would preclude Plaintiff from performing any job, let alone his past relevant work (AR at 60). Thus, the question is whether the above noted inconsistencies amount to substantial evidence to support rejecting the physicians' unanimous opinion on Plaintiff's prospective work absences. The Court is of the opinion that such does not constitute substantial evidence.

"Although it is not necessary in every case to evaluate each treating source medical opinion separately, adjudicators must always be aware that one or more of the opinions may be controlling while others may not." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2P (S.S.A July 2, 1996). Thus, while the ALJ could appropriately reject the conflicting opinions, the question of whether their unanimous opinion should be rejected should have been addressed separately. Turning to that question, a reasonable mind could not accept that the inconsistencies noted above undermine the physicians' opinions about attendance because their disagreement about Plaintiff's ability to sit, stand, and walk, need to shift positions, and need to lie down, has no apparent impact on their agreement that he would often be absent from work more than three times a month. Without more, the ALJ's refusal to afford controlling weight on this ground is not supported by substantial evidence.

    2.  <u>The ALJ Conflated the Two-Step Inquiry</u>.

The ALJ also erred by failing to adequately explain his reasoning for affording limited weight at the second part of the analysis. As noted above, when ALJs refuse to afford controlling weight to an opinion, they "must make clear how much weight the opinion is being given (including whether it is being rejected outright) *and* give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330 (emphasis added). In *Krauser*, the Tenth Circuit remanded an ALJ's refusal to afford controlling weight where the ALJ

completed step one of the analysis, but failed to complete step two.  *Id*. at 1331 (holding

that an ALJ erred where he declined to give the treating source's opinion controlling

weight "and then said no more about it") (quotations and citations omitted)).

Here, although the ALJ assigned a specific weight to the physicians' opinions, he

still did not complete the required task: he stated that the treating physicians' medical

source statements were afforded limited weight but never applied the six factors.

*Krauser*, 638 F.3d at 1331.  *Krauser* requires ALJs to assign a specific weight *and* explain

their reasoning.  Accordingly, the ALJ erred at step two by failing to explain his

reasoning for affording limited weight to the treating physicians' opinions.

As noted earlier, although some overlap exists between the bases for denying

controlling weight and the six factors used to evaluate medical opinions, the Tenth

Circuit has prohibited conflating the two-step analysis.  *Robinson v. Barnhart*, 366 F.3d at

1083 (10th Cir. 2004); *Chrismon v. Colvin*, 531 F. App'x 893, 900-01 (10th Cir. 2013)

(unpublished).  Thus, the Court is precluded from construing the ALJ's reasons for

refusing to afford controlling weight as his application of the six factors in assigning

limited weight.  Ultimately, "[w]hen an individual's application for benefits is denied,

"the notice of the determination or decision must contain specific reasons for the weight

given to the treating source's medical opinion, supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the

weight the adjudicator gave to the treating source's medical opinion and the reasons for

that weight." *Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2P (S.S.A July 2, 1996).  Because the ALJ's abbreviated analysis failed to meet this burden, remand is required.

IV.   **C**ONCLUSION

Plaintiff has demonstrated that the ALJ committed reversible error in his analysis of Dr. Friedman's medical opinions.  Therefore, Plaintiff's Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum (*doc. 24*)  is GRANTED, and this action is REMANDED to the commissioner for further proceedings consistent with this opinion.

   **IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**